# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

VIDA BAPTISTA for herself, and on behalf
of others similarly situated,

    Plaintiff,

-vs-                Case No. 6:10-cv-139-Orl-22DAB

JP MORGAN CHASE BANK. N.A. also
known as Washington Mutual Bank,

    Defendant.

# ORDER

THIS CAUSE comes before the Court upon Defendant JP Morgan Chase Bank, N.A.'s Motion to Dismiss (Doc. 10, filed Mar. 1, 2010), to which Plaintiff Vida Baptista responded in opposition (Doc. 20, filed Apr. 5, 2010). Plaintiff filed this putative class action alleging that Defendant's policy of charging fees as a condition of cashing checks for non-account holders violates Fla. Stat. § 655.85 and constitutes unjust enrichment. Defendant argues that the Florida statute in question is inapplicable, and to the extent that it is interpreted to preclude the check-cashing fee, such an interpretation is preempted by federal law. After careful review of the parties' submissions and the pertinent law, the Court determines that Defendant's motion is due to be granted.

## I. BACKGROUND

Around October 1, 2009, someone having an account with Defendant wrote a check instructing Defendant to release $262.48 to Plaintiff upon demand. On October 6, 2009,

Plaintiff presented the check, in person, to Defendant for payment. Defendant informed Plaintiff that there was a $6.00 service charge for non-account holders. Though she protested, Plaintiff needed the money and agreed to the check-cashing fee.

Plaintiff has filed a two-count putative class action against Defendant. (Doc. 1, filed Jan. 28, 2010.) In Count I, Plaintiff brings a claim under Fla. Stat. § 655.85, which Plaintiff asserts prevents banks from cashing checks at less than par value. In Count II, Plaintiff asserts a claim of unjust enrichment.

## II. LEGAL STANDARD

In deciding a motion to dismiss, the court must accept as true all the factual allegations in the complaint, drawing all inferences derived from those facts in the light most favorable to the plaintiff. Brown v. Crawford County, 960 F. 2d 1002, 1010 (11th Cir. 1992). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984); Little v. N. Miami, 805 F. 2d 962, 965 (11th Cir. 1986). To this end, a plaintiff must supply "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

## III. DISCUSSION

### A. *Count I: Fla. Stat. § 655.85*

1. Applicability

Section 655.85, Florida Statutes provides:

> Settlement of Checks. Whenever any check is forwarded or presented to an institution for payment, **except when presented by the payee in person**, the paying institution or remitting institution may pay or remit the same, at its option, either in money or in exchange drawn on its reserve agent or agents in the City of New York or in any reserve city within the Sixth Federal Reserve District; **however, an institution may not settle any check drawn on it otherwise than at par**. The provisions of this section do not apply with respect to the settlement of a check sent to such institution as a special collection item.

Fla. Stat. § 655.85 (emphasis added). "Institution" is defined as "any state or national bank." Fla. Stat. § 655.769(4). Thus, the statute applies to Defendant.

As an initial matter, neither party asserts that the check Plaintiff presented was a special collection item. The pertinent question, therefore, is whether the par value clause after the semicolon is subject to the exception in the preceding clause. Defendant argues that the exception in the first clause means that a bank is not required to settle a check at par when the check is presented by the payee in person. Because this is what Plaintiff did, the statute is inapplicable. (Doc. 10 at 3.) Plaintiff contends that the par value clause is not subject to the exception. Thus, according to Plaintiff, a bank must settle any check drawn on it at par value, no matter the source, including those presented by the payee in person. (Doc. 20 at 2.)

The Court agrees with Defendant that § 655.85 does not apply to Plaintiff; but for a different reason. A review of the statute's history reveals that rather than dealing with how

-3-

banks transact with individuals, § 655.85 only bars check-cashing fees on bank-to-bank transactions. Plaintiff's interpretation attempts to divorce the language of this statute from its history.

Before being recodified at its current section in 1992, § 655.85 was Fla. Stat. § 659.411. The original title of this section was "Exchange Rates." Fla. Stat. § 659.411 (1955). At the time the Federal Reserve Act was enacted, and for decades following, many banks charged fees for paying checks drawn on them when sent through the mail on behalf of the depository bank. These fees were called "exchange."[1] Banks charging exchange rates were known as "nonpar banks." Howard H. Hackley, *Our Discriminatory Banking Structure*, 55 VA. L. REV. 1421, 1452 (1969). Essentially, an exchange rate was a premium at which balances in a distant bank were made available locally. WALTER E. SPAHR, THE CLEARING AND COLLECTION OF CHECKS 103-05 & n.24 (1926).

After its establishment, the Federal Reserve attempted to establish a uniform check clearing and collection system based on par remittance. Id. at 232. A number of states heavily resisted these efforts. Florida was one such state and enacted a law authorizing exchange rates. Id. at 252 (citing *Laws of Florida*, 1921, Ch. 8532). Florida's exchange rate law, later codified at § 659.411, authorized an exchange fee at least as late as 1955.[2] Edward L. Rubin, *Uniformity*,

---

[1]This is also described as a "retail payment." Ed Stevens, *Non-Par Banking: Competition and Monopoly in Markets for Payment Services* 1 (Federal Reserve Bank of Cleveland, Working Paper 9817, 1998).

[2]Fla. Stat. § 659.411 (1955) provided:
Exchange rates. - Bank may charge for exchange not exceeding one-eighth of one per cent when paying or remitting for checks drawn upon them; whenever a check or checks are forwarded or presented to a bank for payment, except when presented by the payee in person, the paying bank or remitting bank may pay or remit the same, at its option, either in money or in exchange drawn on its reserve agent or agents in the city of New York or in any reserve city within the sixth federal reserve district; and, at its option, it may charge for such exchange not exceeding one-eighth of one per

*Regulation, and the Federalization of State Law: Some Lessons from the Payment System*, 49 OHIO ST. L.J. 1251, 1255 (1989). These laws were upheld by the Supreme Court in 1923. See Farmers' & Merchants' Bank v. Fed. Reserve Bank, 262 U.S. 649 (1923).

By 1967, however, it appears that Florida had given way and amended § 659.411 so that it virtually mirrors the language of the present statute. Indeed, the Journal of the Senate from July 6, 1967 shows that the legislature adopted the current language to repeal the authorization of exchange rates on certain items. Journal of the Senate, July 6, 1967. This statute was recognized by at least one commentator as an example of states requiring nonpar banks to pay all checks at par. Hackley, *Our Discriminatory Banking Structure*, 55 Va. L. Rev. at 1453 n.6. As alluded to above, it was not until 1992 that the statute was recodified at § 655.85 with the new title "Settlement of Checks." The statute, therefore, deals with inter-bank transactions and the payee under this section is actually the bank where the check is being deposited instead of the person to whom the check is addressed. As a result, § 655.85 is inapplicable to Plaintiff.

Practical considerations also support this conclusion. Importantly, neither this statute nor its predecessor has ever been interpreted by a court in this state—state or federal. Moreover, at least eight other states have substantially similar statutes on their books, and no court has held that the law has the meaning that Plaintiff attributes to it.[3] Nevertheless, assuming that § 655.85

---

cent of the aggregate amount of the checks so presented and paid; provided, that a minimum charge of twenty-five cents may be made; provided further, that the provisions of this section and Section 659.412 shall not apply to foreign bills of exchange.

[3] See A.C.A. § 23-47-206 (2010); Iowa Code § 524.819 (2010); Minn. Stat. § 48.158 (2009); Mo. Rev. Stat. § 362.222 (2010); Neb. Rev. Stat. § 8-153 (2010); N.D. Cent. Code § 6-03-68.1 (2010); S.D. Codified Laws § 51A-4-12 (2009). As discussed below, the Georgia Statute, O.C.G.A. § 7-1-372 (2010), was interpreted together with another statute to prevent the cashing of checks at less than par value. Those statutes were held to be preempted.

does apply to Plaintiff, it is preempted by the National Bank Act ("NBA"), 12 U.S.C. § 21 *et seq.*, and its implementing regulations.

2. Preemption

When state and federal law conflict, the latter prevails by operation of the Supremacy Clause. U.S. Const. art. VI, cl. 2. The familiar taxonomy of preemption identifies three categories of conflict: (1) express preemption; (2) field preemption; and (3) conflict preemption. Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1167 (11th Cir. 2008). Express preemption occurs when Congress affirmatively displaces state law in the text of a federal statute. Id. Field preemption occurs when Congress has so thoroughly legislated in an arena that it is reasonable to infer that Congress has left no room for additional state regulation. Id. Finally, "[c]onflict preemption occurs either when it is physically impossible to comply with both federal and the state law or when the state law stands as an obstacle to the objective of the federal law." Id. In this case, there is no contention that either express or field preemption applies. The Court's focus, therefore, is on conflict preemption.

Although a presumption against preemption normally exists, the regulation of national banks is one area where the opposite holds true. The Supreme Court has interpreted "grants of both enumerated and incidental powers to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." Barnett Bank, N.A. v. Nelson, 517 U.S. 25, 32 (1996). Our federal system allows states to regulate national banks "where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 12 (2007). Thus, if § 655.85

"significantly impair[s] the exercise of [Defendant's] authority, enumerated or incidental under the NBA, the State's regulations must give way." Id.

3. Statutory and Regulatory Analysis

Defendant is organized under the NBA and conducts business in Florida. The NBA authorizes national banks to "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). The "business of banking" is not limited to those powers specifically enumerated in § 24 (Seventh). Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258 n.2 (1995).

The Officer of the Comptroller of the Currency ("OCC") is the agency charged with regulatory and supervisory power over national banks. 12 U.S.C. § 93(a); Watters, 550 U.S. at 6. It bears responsibility "for surveillance of the 'business of banking' authorized by 24 (Seventh)." Nationsbank, 513 U.S. at 256 (internal citations omitted). The OCC has issued regulations defining the "incidental powers" of national banks. In particular, the OCC authorizes national banks to "charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). Furthermore, "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion." 12 C.F.R. § 7.4002(b)(2).

Although § 7.4002(a) does not define "customer," the OCC has defined it to mean "any party that obtains a product or service from the bank." OCC, Interpretive Letter No. 934 (Aug. 20, 2001). Moreover, the OCC has issued at least four interpretive letters stating that banks may charge check-cashing fees to customers. OCC, Interpretive Letter No. 932 (Aug. 17, 2001);

OCC, Interpretive Letter No. 933 (Aug. 17, 2001); OCC, Interpretive Letter 934 (Aug. 20, 2001); OCC, Interpretive Letter No. 1094 (Feb. 27, 2008). Thus, the OCC interprets 12 U.S.C. § 24 (Seventh) and 12 C.F.R. § 7.4002(a) together as allowing national banks to charge check-cashing fees to account holders and non-account holders alike.[4]

Of course, the Court is not bound by the OCC's definition of "customer." Nevertheless, where an agency interprets its own regulations, the agency's interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." Univ. Health Servs., Inc. v. HHS, 1230 F.3d 1145, 1149 (11th Cir. 1997) (quoting and citing Auer v. Robbins, 519 U.S. 452, 461 (1997)). Several federal courts have upheld the OCC's definition of "customer" as a reasonable interpretation of its regulation. In Wells Fargo Bank of Tx, N.A. v. James, 321 F.3d 488 (5th Cir. 2003), the Fifth Circuit held that a Texas statute prohibiting charging non-account holder payees a check-cashing fee was preempted. In reaching that conclusion, the court determined that while the OCC's definition of customer was not the only possible one, it was reasonable. James, 321 F.3d at 494-95. Likewise, in Bank of Am., N.A. v. Sorrell, 248 F. Supp. 2d 1196 (N.D. Ga. 2002), the Northern District of Georgia held that two Georgia statutes preventing banks from charging a fee to non-account holders for cashing a check drawn on the bank was preempted. Relying on the OCC's definition of "customer," the court found that the state

---

[4] Plaintiff argues that the Court may no longer rely on the OCC's definition of "customer" because other OCC interpretive letters describe non-account holders seeking to cash a check as "noncustomers." (Doc. 20 at 12 n.3.) This argument is without merit. The letters Plaintiff cites do not use the term "noncustomer" to redefine "customer" as used in § 7.4002(a). The letters Plaintiff cites also rely on the Fifth Circuit's decision in Wells Fargo Bank of Tx, N.A. v. James, 321 F.3d 488 (5th Cir. 2003) upholding the OCC's definition of "customer" in Interpretive Letter No. 934. What's more, these letters actually reaffirm and explain the basis for the OCC's determination that national banks are permitted to charge check-cashing fees to non-account holders. OCC, Interpretive Letter No. 1054 (July 27, 2005); OCC, Interpretive Letter No. 1055 (Aug. 2, 2005). Lastly, the OCC employed this definition of "customer" as recently as 2008 in Interpretive Letter No. 1094.

statutes prevented national banks from charging fees permitted by 12 U.S.C. § 24 (Seventh) and 12 C.F.R. § 7.4002(a). The court concluded that "[a]s such, there exist no questions of fact that the Georgia statutes are in direct conflict with the National Bank Act, and therefore are preempted." Sorrell, 248 F. Supp. 2d at 1199. See also Bank of Am. v. City and County of San Francisco, 309 F.3d 551, 563-64 (9th Cir. 2002) (holding that 12 U.S.C. § 24 (Seventh) and 12 C.F.R. § 7.4002(a) together preempt municipal ordinances limiting the authority of national banks to collect ATM fees); Green v. Charter One Bank., N.A., No. 08 C 1684, 2010 U.S. Dist. LEXIS 25181, at *5 n.1 (N.D. Ill. Mar. 16, 2010) (finding the OCC's definition of customer reasonable and consistent with a common understanding of the word customer and holding that the NBA authorized fees on gift cards); NNDJ, Inc. v. Nat'l City Bank, 540 F. Supp. 2d 851, 854-55 (E.D. Mich. 2008) (relying on OCC definition of customer to hold that state law claims challenging fees for cashing official checks presented by non-account holder payees were preempted); Monroe Retail, Inc. v. Charter One Bank, N.A., 624 F. Supp. 2d 677, 686-88 (N.D. Ohio 2007) (finding that the OCC's definition of customer was reasonable and that Ohio's garnishment fee statute was preempted); Kronemeyer v. U.S. Bank, N.A., 857 N.E.2d 686, 689-91 (Ill. App. Ct. 2006) (relying on OCC definition of customer to preempt state law claims challenging check-cashing fee charged to non-account holder payees).

Similar to these cases, the Court finds that deference to the OCC's interpretation of § 7.4002(a) is appropriate. Nothing in the NBA or § 7.4002(a) indicates that a narrower definition of "customer" is required. The availability of a bank's services to those who present instruments in person—even to non-account holders—does not take the provision of those

services outside the realm of "the business of banking." Moreover, the cashing of checks presented by the payee in person is not a new service for banks. On the contrary, it is a quintessential banking activity. See City and County of San Francisco, 309 F.3d at 563 ("The depositing of funds and the withdrawal of cash are services provided by banks since the days of their creation. Indeed, such activities define the business of banking."). Charging a fee for this service thus falls squarely within the incidental powers granted national banks by the NBA. At bottom, the OCC's definition of "customer" is neither clearly erroneous nor contrary to § 7.4002(a) and is controlling. Indeed, the OCC's definition is consistent with the dictionary definition of customer as "one that purchases a commodity or service." WEBSTER'S NEW COLL. DICTIONARY 318 (9th ed. 1984).

Plaintiff argues that § 655.85 does not significantly interfere with this regulatory scheme. Specifically, Plaintiff asserts that "[f]ederal law does not expressly authorize national banks to charge the subject fee "to the payee" or settle checks drawn [on] it other than at par, when presented by the payee in person, and because § 655.85 does not categorically prohibit national banks from charging the subject fee, § 655.85 does not significantly interfere with federal law, and is not preempted." (Doc. 20 at 8.)

Federal law does, however, authorize national banks to charge the subject fee to the payee when presented by the payee in person. Under § 7.4002(a), a national bank "may charge its customers non-interest charges and fees" for the banking services it provides. 12 C.F.R. § 7.4002(a). To be sure, it is unclear whether Congress intended to authorize this particular fee. Because the OCC has stepped in and filled regulatorily the gap by authorizing check-cashing

fees, that judgment will be given controlling weight if reasonable. James, 321 F.3d at 493 n.8. Under normal circumstances, the preemptive effect of this regulation is guided by the well-worn Chevron framework. Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984). But Plaintiff does not contest the reasonableness of § 7.4002(a) or argue that the OCC exceeded the bounds of its statutory authority. Instead, Plaintiff maintains that § 655.85 only prevents the fee from being charged when the payee presents the check in person.[5] Yet the OCC's regulation applies to "customers," and draws no distinction in how an individual customer presents his or her check with respect to a bank's authority to collect fees for performing services. It follows that the check-cashing fee is authorized whether the check is presented by the payee in person or through some other means. Stripped to its core, Plaintiff's argument is essentially that a state may prohibit a subset of national bank activity that federal law categorically allows. This the Supremacy Clause does not allow; state prevention of the exercise of federally authorized power is irreconcilable conflict, despite Plaintiff's narrow definition.

Moreover, the OCC grants national banks considerable discretion in determining how to establish authorized fees. Section 7.4002(b) provides that "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2).[6] Under § 7.4002(b)(2), Defendant's

---

[5] The Court notes that this argument conflicts with Plaintiff's previous interpretation of the statute in which she asserted that § 655.85 prevents the settling of checks at less than par, no matter the source.

[6] Section 7.4002(b)(2) goes on to identify a number of factors that banks should consider in establishing non-interest charges and fees. See 12 C.F.R. § 7.4002(b)(2)(i) - (iv). Plaintiff does not challenge Defendant's decision-making process for establishing the fee in question.

decision to charge the subject fee to the payee—even when the check is presented in person—was a business decision committed to its discretion by federal law. Thus, Plaintiff's interpretation of § 655.85 would allow state law to significantly interfere with a national bank's ability to set and collect federally authorized service fees.

Plaintiff relies on the recent Supreme Court decision of Cuomo v. Clearing House Ass'n, L.L.C., 129 S. Ct. 2710 (2009), for the proposition that the Supreme Court "caused a sea change in the perception of the preemptive effect of the NBA and OCC regulations." (Doc. 20 at 14) (quoting Mwantembe v. TD Bank, N.A., 669 F. Supp. 2d 545, 549 (E.D. Pa. 2009)). In Cuomo, the New York Attorney General sent letters to several national banks "in lieu of subpoena" requesting the production of non-public information. Cuomo, 129 S. Ct. at 2714. The respondents filed suit seeking to enjoin the production because OCC regulations defining visitorial powers preempted the enforcement of state law. The Court held that "a sovereign's 'visitorial powers' and its power to enforce the law are two different things" and the NBA only preempts the former. Id. at 2717. The Court's analysis and holding are irrelevant here. Cuomo dealt with the definition of visitorial powers and whether an OCC regulation preempting state laws of general applicability was an unreasonable interpretation of the NBA. The opinion did not address state limitations on a national bank's assessment of authorized fees. That the NBA does not preempt state laws of general applicability does not mean that other state laws regulating national banks' authorized activity are also not preempted.

Plaintiff's reliance on Mwantembe is similarly misplaced. There, the plaintiffs challenged the national banks' deduction of undisclosed fees on gift cards under the

-12-

Pennsylvania Unfair Trade Practices and Consumer Protection Law. Mwantembe, 669 F. Supp. 2d at 547. The plaintiffs alleged that the fees were "deceptive, unlawful, and misleading." Id. The court found no conflict between the state law and the OCC regulations. Id. at 553-54. Unlike Plaintiff's claim here, the claims in Mwantembe were based on a state law of general applicability that imposed a duty not to engage in deceptive and misleading business practices. As the court in Mwantembe noted, the state law was not directed at authorized national bank activity, nor did it mandate what national banks can or cannot do. Id. at 553. By contrast, § 655.85 is directed solely at banks and, under Plaintiff's interpretation, would prohibit federally authorized activity. Simply put, there is a difference between challenging a national bank's power to do something and challenging the manner in which it is done. Mwantembe is accordingly distinguishable.

In short, Plaintiff's claim under § 655.85 is preempted. Federal law authorizes national banks to charge customers a check-cashing fee, whether or not the payee presents the check for payment in person. Plaintiff's interpretation of § 655.85 would prohibit the national banks from setting and collecting these federally authorized fees. Plaintiff's claim, therefore, "significantly impair[s] the exercise of [Defendant's] authority . . . [and] must give way." Watters, 550 U.S. at 12.

*B. Count II: Unjust Enrichment*

In Count II, Plaintiff brings a claim for unjust enrichment. (Doc. 20 at 3-4.) Plaintiff does not allege any additional facts to support this claim. Instead, Plaintiff bases her claim for unjust enrichment on the same facts underlying her claim in Count I. Just as with that claim,

Count II seeks damages from Defendant based on its exercise of a power granted national banks under the NBA and OCC regulations. Count II thus stands in irreconcilable conflict with federal law and is preempted.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** as follows:

1. Defendant's Motion to Dismiss is **GRANTED**.

2. Because amendment would be futile, all of Plaintiff's claims against Defendant are hereby **DISMISSED with prejudice**.

3. All pending motions are hereby **DENIED** as moot.

4. The Clerk is directed to **CLOSE** the case.

**DONE and ORDERED** in Orlando, Florida on this _7_ day of June, 2010.

Anne C. Conway
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties